UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NORTHWEST ADMINISTRATORS, INC., <br><br> Plaintiff, <br><br> v. <br><br> WASTE MANAGEMENT OF WASHINGTON, INC., <br><br> Defendant. | No. C05-1130MJP <br> C05-1333MJP <br><br> ORDER ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT |

These consolidated cases come before the Court on the parties' cross motions for summary judgment. (Dkt. Nos. 20, 24 & 25). The parties' dispute arises out of an arrangement between Defendant Waste Management of Washington, Inc. ("WM") and Teamsters Local 117 to have Local 117 recycling workers fill in for Teamsters Local 174 waste workers when there is a need for temporary replacements. Plaintiff Northwest Administrators ("NWA") claims that when Local 117 workers do replacement sanitation work normally done by Local 174 union members, WM fails to contribute adequate benefits to the Teamsters Pension and Retirees' Welfare Trusts on behalf of Local 117 employees. Having considered the parties briefing and all supporting documentation, the Court GRANTS summary judgment on behalf of Defendant Waste Management on its motion regarding the Pension Trust and DENIES Plaintiff's Motion as to the Pension Trust. The Court also DENIES Defendants' Motion regarding the Retirees' Welfare Trust and GRANTS Plaintiff's Motion as to the Retirees' Welfare Trust. Defendant is ordered to pay Retirees' Welfare Trust contributions

ORDER - 1

for Local 117 workers doing temporary Local 174 sanitation work from December 5, 2000, until present, as well as any applicable liquidated damages, interest, attorneys fees and litigation costs.

BACKGROUND

Defendant WM is a corporation that provides waste collection and disposal services in the greater Puget Sound region. Relevant to the current motions, it employs two separate unions to perform its trash collection and recycling work. Local 174 handles the trash collection, or sanitation, duties and its members are typically compensated at a higher rate than the Local 117 members who work for WM performing recycling work. Under the terms of the unions' CBAs, Local 174 members receive a higher rate of pay and higher contributions to the Pension Trust, by about $3.00 per hour, than do members of Local 117. Local 174 members are also entitled to contributions by WM to the Teamsters Retirees' Welfare Trust ("RWT"), while Local 117 members receive no such contributions. (P's Mot. at 1-2).

Because of the higher pay and more generous benefits associated with membership in Local 174, Local 117 members have contracted with WM to fill permanent vacancies for sanitation work with senior members of Local 117. This agreement is reflected in the CBA between WM and Local 117. (Pl's Ex. J at 487). In order to prepare for these more desirable positions, Local 117 members have also contracted with WM to do replacement sanitation work when there are not enough Local 174 members to do the work, due to an unusually high workload, injuries, or other types of leave. In this way, Local 117 members can be trained to do the Local 174 members' jobs, while still retaining recycling positions. When Local 117 members do this replacement sanitation work, their contract provides for them to be paid at the rates applicable to Local 174 members under the Local 174 CBA. However, the plain language of the Local 117 CBA does not explicitly provide for WM to pay extra benefits to Local 117 workers when they perform substitute sanitation work.

Plaintiff NWA claims that under the Trust's rules, all compensation for an individual should be determined by the type of bargaining unit work he is doing. Based on this principle, NWA argues that WM should have also been making the same contributions to the Pension Trust and the RWT for

ORDER - 2

Local 117 workers doing temporary replacement work as WM made for Local 174 members. The failure of WM to make these Trust contributions, argues Plaintiff, creates a shortfall in the Pension Trust of $324,604.28. Related to the alleged Pension shortfall, NWA also seeks liquidated damages totaling $64,920.86 for the period of July 1, 2001 to May 31, 2003, interest accruing until paid in full, as well as attorney's fees and costs incurred by NWA in connection with this action. In addition, NWA is claiming a Retirees' Welfare Trust shortfall of $21,240.05, as well as liquidated damages of $4,248.01 between January 1, 2001, and February 29, 2004, interest, attorney's fees and litigation costs. Plaintiff claims that the failure of an employer to make the same trust contributions for every person doing bargaining unit work causes damage to the Trusts because it undermines the actuarial principles upon which Trust benefits are calculated.

Defendant, on the other hand, cross-moves for summary judgment, alleging that the extra contributions that NWA is demanding are nowhere provided for in the Trust Agreements or the CBAs between the WM and the unions. WM also states that because it was audited during the relevant time period and this issue was not brought up, it did not have notice of the Trust's policy that equal compensation follows bargaining unit work, rather than the bargaining unit membership.. Defendant also notes that the unions never grieved this issue. For these reasons, it opposes NWA's motion to have WM make trust contributions retroactively for Local 117 workers who performed substitute sanitation work when Local 174 members were unavailable.

## ANALYSIS

I.  Summary Judgment Standard

This matter is before the Court on the parties' cross- motion for summary judgment. Summary judgment is not warranted if a material issue of fact exists for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. Id. at 324.

## II. Evidentiary Issues

Before launching into the analysis of the merits of this case, the Court must address the evidentiary issues raised by both parties. Defendant states, in its responsive brief (Dkt. No. 35) that Exhibit N, a letter co-authored by Dan Scott and Joe Tessier, reflects insufficient knowledge of the information contained therein and should be struck. The letter addresses the unions' understanding of their CBAs with WM. Defendant claims that Mr. Tessier and Mr. Scott cannot testify to this understanding because neither took a sufficiently active role in the negotiations of the relevant CBAs. The Court finds, however, that Mr. Tessier and Mr. Scott are able to make representations about their understanding of the contracts and past union activities in their roles as leaders of the Unions. For this reason, the Court will not strike this document, but will take Defendant's arguments into account when deciding the appropriate amount of weight to accord this letter.

Additionally, after the briefing was complete on cross-motions, Defendants submitted a letter to the Court asking for summaries of Trust audits to be struck. In Response, Plaintiffs demand that the Declaration of Nina Waring, submitted by Defendants be struck. A letter is not the appropriate avenue by which to request that evidence be struck; however, the Court has determined that none of the documents addressed in the parties' letters are material to the outcome of these motions. For this reason, the Court does not reach the requests to strike contained in the parties' letters.

## III. ERISA and Contract Interpretation

ORDER - 4

In actions to collect allegedly delinquent trust contributions, the trust fund stands in the role of the third-party beneficiary to a contract between the employer and the union. <u>Southwest Administrators, Inc. v. Rozay's Transfer</u>, 791 F. 2d 769, 773 (9th Cir. 1986). Recognizing the importance of trusts' viability to workers who depend on them for retirement and other benefits, Congress amended ERISA in 1980 to limit the range of defenses available to employers from whom trusts are attempting to collect delinquent payments. <u>Id</u>. Moreover, the trustees possess "'exclusive authority and discretion to manage and control the assets of the plan.'" 29 U.S.C. §§1102-1103, <u>quoted</u> <u>in</u> <u>La</u> <u>Barera v. J.D. Collyer Equipment Corp.</u>, 337 F. 3d 132, 136 (2nd Cir. 2003). However, many benefits from trusts organized under ERISA are dependant upon the relevant collective bargaining agreements between employers and unions. <u>Board of Trustees of the Watsonville Frozen Food Welfare Trust Fund v. California Cooperative Creamery</u>, 877 F. 2d 1415, 1426 (9th Cir. 1989). When "a provision of a CBA is ambiguous, its interpretation depends on the intent of the parties to the CBA at the time of its execution." <u>Id</u>.

### IV. Interpreting the Contracts

In analyzing the current dispute, the Court must look to the contractual language drafted by the parties that is relevant to the issue of Local 117's substitute sanitation work. Four documents are particularly relevant to this inquiry: the Pension and Retirees' Welfare Trust documents and Local 174's and Local 117's CBAs with Defendant. The Court will first examine these documents with regard to the Pension Trust. The Court will then address the Retirees' Welfare Trust.

#### A. The Pension Trust

##### 1) The Trust Agreement

Plaintiff argues that Defendant WM should have known, based on the Pension Trust Agreement that the Trust's policy was to not accept different levels of contributions on behalf of employees doing the same bargaining unit work. In support of this argument, NWA states that the Pension Trust instrument gives the Trustees wide discretion to interpret and make the rules governing the trust agreements. (<u>See</u> <u>e.g.</u> Ditter Decl., Ex. A at Art.V, §1(c) and Art. XI, §5). Defendant claims

ORDER - 5

that it did not have notice of this policy because it is not reflected in the Trust Agreement or contained in its CBAs with the unions. Moreover, the unions never grieved the failure of Defendant to make additional Pension Trust contributions on behalf of Local 117 employees doing temporary sanitation work and the trusts both conducted audits of Defendant for the 1999-2001 time frame and for time periods prior to that, yet never alerted Defendant there was a defect in the manner in which it was making contributions until after the 2003 audit. (Dkt. No. 24 at 8).

Plaintiff rebuts these arguments by noting that WM signed subscriptions to the Pension Trust each time they renewed the CBAs with their unions. Each of these subscriptions contain a Policy on Acceptance of Employee Contributions ("Policy on Acceptance").

The Policy on Acceptance attached to the Pension Trust reads as follows, in relevant part, as of April 1, 2000:

> It is the policy of the Trustees of The Western Conference of Teamsters Pension Trust Fund to accept as Employer Contributions only payments made in accordance with a Pension Agreement that is not detrimental to the Plan. The determination of whether or not a Pension Agreement is detrimental to the Plan shall be made by the Trustees in their sole discretion. However, the list of provisions that follows is furnished as an illustration of those whose inclusion in a Pension Agreement may result in a determination by the Trustees that the Pension Agreement is detrimental to the Plan. It should be noted, however, that the list is not intended as an inclusive list of all such types of provisions. . .
>
> 6. Provisions which permit or require pension contributions for persons who are not members of the bargaining unit. . .
>
> 8. Provisions that provide different contribution rates within the same job classification other than during the specified waiting period as defined in Number 3 above. . .

(Ditter Decl., Ex. A at 35). Defendants argue that this language is confusing because, on the one hand, provision 6 of the Pension Policy on Acceptance appears to prohibit employers from making pension contributions for a person outside of the bargaining unit. However, provision 8 requires the same pay for people doing the same job. Plaintiff argues, however, that it has always been the policy of the Pension Trust to require the same pay for people doing the same bargaining unit work and that the work, rather than union affiliation, defines the bargaining unit. Plaintiff cites no authority for this assertion. In his deposition, Michael Sander, administrative manager of the Pension Trust stated that

ORDER - 6

the language in provision 6 was meant to refer to people such as union members' family members who are doing no work and cannot have pension contributions made on their behalf. (Sander Dep. at 54, lns. 11-22). This intent, however, is not clear from the face of this document. The document could easily be interpreted to mean, as WM suggests, that pension contributions may not be made under the terms of the Local 174 CBA for employees in a different bargaining unit, such as Local 117. For this reason, the Court finds that the terms of the Pension Trust give ambiguous direction to an employer regarding how contributions are to be made in situations where members of two different unions are doing the same work. For this reason, the Court does not find that the Trust instrument resolves the parties' dispute regarding Pension contributions and must examine the underlying CBAs.

### 2) The Collective Bargaining Agreements

#### a. Local 174's Collective Bargaining Agreement:

Local 174's CBA provides for temporary replacement employees when union members are not available to do the work because of injury, vacation, or an inordinately heavy work load. Article 24 of the Local 174 CBA, provides:

> 24.01 Supervisory and other non-bargaining unit employees may perform bargaining unit work for the purpose of training or in emergency situation, or where a sufficient number of bargaining unit employees are not available after a reasonable attempt by management. The foregoing is not intended to apply to newly acquired bargaining unit work for which no employees have been employed. . . .
>
> 24.02 Except as otherwise provided in this Agreement, the Employer must not make unilateral changes in wages, hours, or other terms and conditions of employment of bargaining unit employees, without prior good-faith consultation and bargaining with the Union concerning the effects of such changes.
>
> 24.03 Bargaining unit work may be assigned or contracted only under the following circumstances: with the written approval of the Union, or where required pursuant to law or government regulations or WMBE requirements. This restriction does not impact the right of the Employer to move Local 174 bargaining unit work from one Waste Management group to another, so long as the Employer complies with Section 24.02.

(Pl's Ex. E, Art. 24). Plaintiff claims that it reads a qualifying term into clause 24.01 of this contract, allowing only for "incidental" amounts of replacement work for the purposes of training or in

ORDER - 7

emergencies (Sander Dep. at 36, lns. 10-16).  Upon review of how WM was using this substitution mechanism, the Pension Trust found that the number of hours Local 117 workers were filling in for Local 174 members was more than "incidental," and that Local 117 workers doing this labor must receive trust contributions equal to those of Local 174 workers. (Id at 36-38).  Defendant WM claims that it was unaware of the "incidental" qualifier on the Local 174 CBA and that it did not have fair notice of the Pension Trust's policy.  For this reason, WM argues that the Court should follow the plain language of the CBAs and not enforce the Pension Trust retroactively as to Local 117 workers doing temporary sanitation duties.

### b. Local 117's Collective Bargaining Agreement

Local 117's CBA also addresses the practice of allowing Local 117 members to do substitute labor for sanitation workers in Local 174.  It provides:

> 15.09 Qualified employees working under this Agreement will be awarded permanent vacancies in the Waste Management Sno-King sanitation (Local 174) bargaining unit based upon seniority.  The Company will use its best efforts to give those employees who so desire the opportunity to qualify on equipment outside their own job category.  An employee so transferring will be paid not less than eighty percent (80%) of the appropriate rate of pay under the sanitation Agreement.  At such time as the employee becomes eligible for vacation benefits under the sanitation Agreement, he/she will be credited with time worked as a regular employee under this Agreement for the sole purpose of determining the level of vacation benefits. . .

(Pl's Ex. J at 487). Defendant argues that this provision only provides for Local 117 members to receive a higher rate of pay when they do sanitation work, but that the agreement does not anticipate higher rates of Trust contributions for this work.  Joe Tessier, Executive Assistant to Local 117, states in a letter to the Administrative Manager of the Pension Trust that,

> the Local 174 Agreement does specifically reference a different wage schedule based on hours worked that provides a progression to 100%.  As you are aware, the Agreement contains no such provision for pension.  It has always been our understanding and intention that in accordance with Trust rules, the contract that the member is performing work under, dictates the pension rate to be paid.

(Pl's Ex. N at 1196).  However, Mr. Tessier noted in his deposition that, he did not recall addressing the issue of pension and welfare trust contributions for 117 members who were filling in on sanitation work:

ORDER - 8

> Q: Sitting here today, you don't recall the particular topic of the pension contributions ever coming up at the bargaining table in terms of what was happening with your members on temporary assignment in the sanitation work?
> A. I don't have a specific recollection of it, no.

(Tessier Dep. at 210, lns. 11-15). Later in Mr. Tessier's deposition, he acknowledges that Local 117's CBA only addresses wages for temporary sanitation workers:

> Q: Now, nowhere in this document does it discuss paying the local 174 pension, health and welfare or retiree trust contribution when Local 117 members are doing temporary assignments in sanitation.
> A. It strictly discusses wages.

(Id. at lns. 21-25). Ordinarily, contracts involve the mutual assent of the contracting parties–the Union and the employer, in this case–and cannot be unilaterally modified by one of the parties without the consent of the other. Jones v. Best, 134 Wn. 2d 232, 240 (1998). In ERISA cases, "the parties to a collective bargaining agreement are bound by the terms of their agreement, regardless of their undisclosed intent." Central States, Southeast and Southwest Areas Pension Fund v. Hartlage Truck Service, Inc., 991 F. 2d 1357, 1362 (7th Cir. 1993). Here, there does not appear to be any meeting of the minds reflected in the Local 117 CBA regarding contributions at a higher rate to the Pension Trust for recycle workers doing temporary sanitation work. Plaintiff's submission of Mr. Tessier's and Mr. Scott's letter does not raise a material issue of fact in this regard because Mr. Tessier's deposition testimony demonstrates that the Union's understanding in this regard was a mere assumption and not part of the bargained for agreement. Accordingly, the Court GRANTS Defendant WM's Motion for Summary Judgment as to the Pension Trust and DENIES in part Plaintiff's Motion in this regard.

B.  The Retirees' Welfare Trust

The Court now turns its attention to the Retirees' Welfare Trust. Plaintiff makes many of the same arguments regarding the Retirees' Welfare Trust that it made in regard to the Pension Trust. It argues that Defendant WM should have known, based on the Retirees' Welfare Trust Agreement that the Trust's policy was to not accept different levels of contributions on behalf of employees doing the same bargaining unit work, and that the Trustees have wide discretion to interpret and make the rules

ORDER - 9

governing the trust agreements (See e.g. Ditter Decl., Ex. B at Art. V, §1(f) and Art. IX, §4). Defendant also offers many of the same defenses: it did not have notice of this policy because it is not reflected in the Trust Agreement or contained in its CBAs with the unions; the unions never grieved the failure of Defendant to make additional Pension Trust contributions on behalf of Local 117 employees doing temporary sanitation work; the trusts both conducted audits of Defendant for the 1999-2001 time frame and for time periods prior to that, yet never alerted Defendant there was a defect in the manner in which it was making contributions until after the 2003 audit. (Dkt. No. 24 at 8). Nonetheless, the Retirees' Welfare Trust must be examined separately from the Pension Trust because the Policy on Acceptance attached to its Trust Agreement contains slightly different language and slightly different factual circumstances surround the Retirees Trust Agreement.

The Policy on Acceptance attached to the Retirees' Welfare Trust reads as follows, in relevant part:

> It is hereby declared to be the policy of the Retiree's Welfare Trust to accept as Employer contributions only payments made in accordance with a Collective Bargaining Agreement and/or Written Agreement which is not detrimental to the Plan.
>
> Accordingly, a Collective Bargaining Agreement and/or Written Agreement which:
> - Does not require monthly contributions to be made on behalf of all persons who perform work in the classifications or categories covered in such Collective Bargaining Agreement. . .
>
> will be deemed to be detrimental to the Retiree's Welfare Trust and said contributions will not be acceptable. . .

(Ditter Decl., Ex. G at 466). Additionally, on December 5, 2000, Plaintiff NWA sent Defendant WM and Teamsters Local 174 a letter alerting them to the fact that Retirees' Welfare Trust contributions must be made for Local 117 workers doing sanitation work on a temporary basis. The letter states: "the entire unit must be covered, not just garbage drivers (i.e. Recycle employees must be reported as well). (Ditter Decl., Ex. H at 470). The Memorandum of Understanding ("MOU") submitted by Plaintiff along with this letter seems to reflect changes that the parties made to the relevant CBA to reflect the Trust's request for changes. (Id. at 469). Although the MOU is somewhat ambiguous about whether or not the CBA between Local 174 and WM was changed to

ORDER - 10

allow contributions to the Retirees' Welfare Trust on behalf of Local 117 workers doing temporary sanitation workers, there is no question that this was one of the modifications requested by Plaintiff.

Additionally, the Policy on Acceptance attached to the Retirees' Welfare Trust subscription agreement does not contain any of the ambiguous language that the Policy on Acceptance for the Pension Trust did. Instead, the Retirees' Welfare Trust's Policy on Acceptance is clear that the Trust requires contributions to be made on behalf of people doing the work described in the Local 174 CBA with WM. This group would necessarily include Local 117 members when they were doing work normally assigned to Local 174 members. For these reasons, the Court finds that the Trust gave adequate notice of its interpretation of the Retirees' Welfare Trust agreement to Defendant WM. Additionally, as noted above, the Retirees' Welfare Trust Agreement gives wide latitude to the Trustees to make and enforce its own rules. Based on these circumstances, the Court finds that Defendant WM should have been making contributions on behalf of Local 117 workers doing temporary sanitation work no later than the date of the December 5, 2000, letter. Defendant's Motion as to the Retirees' Welfare Trust is DENIED and Plaintiff's Motion is GRANTED in part.

## CONCLUSION

The Court GRANTS summary judgment on behalf of Defendant Waste Management on its motion regarding the Pension Trust and DENIES Plaintiff's Motion as to the Pension Trust. The Court also DENIES Defendants' Motion regarding the Retirees' Welfare Trust and GRANTS Plaintiff's Motion as to the Retirees' Welfare Trust. Defendant is ordered to pay Retirees' Welfare Trust contributions for Local 117 workers doing temporary Local 174 sanitation work from December 5, 2000, until present, as well as any applicable liquidated damages, interest, attorneys fees and litigation costs. The parties shall file a notice within ten (10) days of this Order letting the Court know if there are any further issues to be resolved in this litigation.

The Clerk is directed to send copies of this order to all counsel of record.

Dated this 29th day of September, 2006.

Marsha J. Pechman
United States District Judge

ORDER - 11